Honorable Judges of the Eighth Circuit, Mr. Gries, may it please the Court, Your Honors, if I may, I'd like to focus our short amount of time this morning on a couple of Fourth Amendment issues. First and foremost, I note there are several indicated in the briefing of the parties, the pat-down as to whether or not that consent was actually given, and if so, to the extent that it was voluntary, then if we have time, get to the expansion of the scope of the original purpose of the stop, as well as the role enhancement that was applied under 3B1.1 at time of sentencing. As the government notes in its brief, and as the Chaidez case is also cited in the appellant's brief, there are a number of factors to look to as to whether or not, first of all, well, I guess I'd like to step back and talk about the facts of this case as to whether or not consent was actually given. If you look at the record in this case, particularly the testimony that was provided by the officer in this case, Officer Ty Boulder of the Council of the West Police Department, essentially the consent that was inferred by him was related to Espinoza's actions. Those included him following directions which were accompanied by hand gestures and him putting his hands in the air. I don't think that simply acting or behaving in a certain way that is submissive to police conduct can be inferred as consent. The fact of the matter is, is that . . . Have you got a case that holds that? Well, I think you look at the totality of the circumstances, Your Honor, and I think that's the analysis of all the cases. We have a finding of consent, which is clear error review. Well, Your Honor . . . Have you got cases that say, you know, as a matter of law, you can't make the finding based just on conduct? Your Honor, I . . . I don't think there are cases, but I'm prepared to be educated. Well, Your Honor, I'm always prepared to be educated myself as well. However, I do think it's plain error. I think the fact of the matter is that someone putting their hands up who clearly and admittedly in Officer Bulger's questions that he answered on my cross-examination, he acknowledged that English was not Mr. Espinoza's primary language. The fact of the matter is, is that Espinoza, subsequent to the pat-down, at that point in time was given the bilingual Miranda rights card. And if you'll notice under the Chaydez opinion, this court has discussed, you know, the issue of consent and the Miranda rights being advised. In this case, the Miranda rights were provided to the defendant subsequent to what was inferred as his consent. So I think that that tends to negate what his knowledge was prior to allegedly providing consent. Another important . . . The Miranda rights were after he was arrested. He was arrested because of what was found in the pat-down search, right? Well, that is correct, Your Honor. Okay. So now the pat-down search itself, which is what you're challenging . . . Well, I'm talking about consent. But in Chaydez, we talked to . . . the next step of the analysis, in my opinion, is whether or not that consent was actually voluntary. And the fourth factor in the five factors set forth in Chaydez says whether the person consented after being informed of their right to withhold consent. In this case, he was handed a Spanish . . . Okay, but consent to do what? There are a lot of things that consent can . . . Pat him down. Well, yes, but the Chaydez factor doesn't apply here because this was not a situation where Miranda was even in play at the time of the challenged consent. The pat-down is for safety purposes before someone gets in a police patrol car for what is likely to be routine post-traffic stop questioning, right? Respectfully, Your Honor, I disagree with that analysis. I think to the extent that Terry would come into play as to whether officer safety was an issue for the pat-down, I believe that this pat-down was not a Terry pat-down. This was a routine . . . If he refuses to be patted down, then you get into the question of whether he has sufficient suspicion to do it involuntarily. But to request a pat-down before someone gets in your patrol car is . . . it's still a consensual encounter if there's consent. It's like the person stopped on a street who says, yeah, I'll talk to you, as opposed to, no, I'm going to walk away. And I don't think that the consent here was . . . I don't think that he did consent. Now, do you say that the officer commanded him to do things, or do you say the officer requested as though he was seeking consent and it's just that the consent was not voluntary? Those are two different things. There are two different things, I think, first of all. Which is it? Which is it? I think it's both. Well, it can't be both because either the officer asked him in the form of a request or he commanded him to do something. Well, unfortunately, Your Honor, the day this happened, Officer Boulder's video camera mysteriously didn't work. So he had to testify what happened and Judge Gritzner had to make a finding. That is correct, Your Honor. And am I recalling correctly, Judge Gritzner found as a factual matter that it was an ask, it was a request. And I think that's error. You think that's clearly erroneous and that he was ordered to do these things? I do because . . . Based on disbelieving Boulder or what else is there? Well, I think you just looked at . . . you look at . . . you apply a common sense analysis in saying that he says he followed my directions accompanied by hand gestures. I inferred in his . . . this was his testimony. I inferred his consent to pat down because his hands were in the air. And that's what . . . that's where he gets the consent from is that he puts his hands in the air and then when he says things to him in an English language, a defendant who Boulder also admitted English was not the primary language of, that he seems to go along with him when his directions are accompanied by hand gestures. I think giving someone hand gestures is tantamount to commanding them to do something. Do you think the hands in the air was saying, don't touch me? Who knows what it means. It's submissive. Just before he gets in the car, huh? Well, he gives him directions where to place his hands. He's accompanying things. Again, unfortunately, and I have no idea why, the video doesn't get turned on. Something that's available in every case. So I . . . with that, Your Honor, I'm reserving the balance of my time for rebuttal. Thank you. May it please the Court, Counsel. Please. Thank you, Your Honor. Almost from the very beginning, in fact, from the very beginning of this particular encounter, the officer and Mr. Espinoza were communicating effectively in English. It was, in fact, Mr. Espinoza who first flagged the officer down, indicating that he was looking for directions where he could go pay his traffic tickets and fines. And having noticed the fact that there was no front license plate, and the fact that one of the taillights was out, the officer stopped and engaged in contact with Mr. Espinoza. From that point, he asked him for . . . the officer asked Mr. Espinoza for his license, registration, and proof of insurance. Mr. Espinoza provided exactly what he asked for. He asked for Mr. Espinoza to go to the vehicle. Mr. Espinoza did so. He asked for permission to pat him down. At that point, Mr. Espinoza turned around . . . or, excuse me, placed his hands in the car. He understood exactly what the question was. The officer then asked him to place his hands on the car. Mr. Espinoza and Mr. Espinoza, in fact, did so. You think that was not a command when he said, put your hands on the car? That was just a, would you mind putting your hands on the car sort of thing? Absolutely. And I think, obviously, Judge Gritzner was in the best position to evaluate the facts as they were being testified to by Mr. Boldra, and the totality was that this was a completely consensual encounter. In fact, it was an encounter that Mr. Espinoza initially invited. And when the officer engaged him, there was never any indication of any lack of consent on Mr. Espinoza's part. He complied with the requests of the officer every step of the way. Do you really comply with a request, or do you comply with a command? That's one thing I wondered about in reading Judge Gritzner's order, because he uses the defendant complied. Sure. I mean, isn't that an odd way to speak of consent? I see your Honor's point, but I don't think it's odd. If you ask somebody to do something, they either do it or they don't. The fact that the language is complied is just indicating that, in fact, they did exactly what was asked of them. In this case, he was asked to provide his license and registration, go to the vehicle. He was asked for permission to pat him down. If he was going to just pat him down, he could have turned around and done so. But instead, he asked for permission to do so. There was never any indication of a lack of consent. In fact, by his conduct and his behavior, Mr. Espinoza did exactly that. He consented. A little bit further along, during the pat-down, Officer Boldre asked Mr. Espinoza, what is that? If he were under arrest or somehow a command-type situation, he would have just reached in and taken what he felt. But he said, what is that? Mr. Espinoza reached in, pulled the pipe out of the pocket, and placed it on the car. Once again, all along the way, at every point, they are communicating effectively. Because there is effective communication, Judge Gritzer clearly and correctly concluded that this was a voluntary and consensual encounter. And then from that point on, Mr. Espinoza is under arrest, and we're in a completely different situation at that point. There is no expansion of the traffic stop. Searches incident to arrest occur in which some of the other evidence was located in the vehicle. And from that point forward, I don't believe there's any dispute about what happened. There was valid consent here. There is lots of evidence that, in fact, Mr. Espinoza understood English, understood what Officer Boldre was asking of him, and he complied. With regard to the other issues— Does the record reflect whether Officer Boldre knew about the Hall investigation? I do not believe it does. But Officer Boldre, I can tell the court was not aware. Now, whether the record reflects that, I don't believe it does. Officer Boldre was just a patrol officer, by the facts that are presented at the suppression hearing, was just a patrol officer who was patrolling that day and happened to come along when Mr. Espinoza flagged him down asking for directions. With regard to the other issues, briefly, that have been presented for the Court's review today, there is no abuse of discretion for the trial judge, Judge Gristner, to deny either the motion for new trial or the judgment of acquittal motion. Clearly, there's significant evidence here of what Mr. Espinoza was involved in doing. There are multiple witnesses—Richard Hull, Jessica Moreno, and Brandy Ventura—who all testified that Mr. Espinoza provided them with large quantities—pound quantities, in fact—of methamphetamine over a period of time. In addition to that, there was evidence that Mr. Espinoza directed them to handle the money or the drug proceeds in various and specific ways, which they did. There is also direct evidence in the form of intercepted telephone calls that were presented to the jury, which indicated his involvement in the conspiracy. So the Court properly denied those motions at the time they were filed. Finally, with regard to the sentencing issue, the manager or supervisor is clearly supported by preponderance of the evidence in this case. As I just indicated, Judge Gristner found that the trial evidence that Mr. Espinoza directed individuals to perform various acts as part of the conspiracy was sufficient to conclude that he was a manager or supervisor. He directed Mr. Hull to transport money, drug proceeds, in specific ways, and then he directed Ms. Ventura Lopez, who didn't even know Mr. Hull, to go to his house, collect drug proceeds from him, and then in various and specific ways transport those funds back to Mexico, the origin of the drugs, and I believe it was Western Union and also, alternatively—and Mr. Espinoza's direction, those proceeds, those drug proceeds, were actually deposited into bank accounts, and so clearly those are the type of things that the courts generally consider in trying to make a determination about whether somebody is a manager or a supervisor, and the Court did not err and correctly concluded that he was. So those are the issues that are before the Court today. Unless the Court has further questions, I would yield the remainder of my time. Thank you. Mr. Primer, do you have some time? Yes, Your Honor. Thank you, Your Honor, and Judge Loken, to respond to a specific inquiry as to whether or not Officer Bolger was aware of the overall scope of the whole drug conspiracy as being investigated on the date of the Espinoza stop that we've talked about in my primary argument, I believe the record actually in the suppression hearing transcript, page 35, line 13-20, when asked on cross-examination, Officer Bolger acknowledged that he believed Espinoza was part of a larger drug conspiracy when he pulled him over, despite having no knowledge as to whether or not Espinoza was under investigation at the time. So I do believe that there is—that does a couple of things. It demonstrates that perhaps—well, I think it demonstrates that the stop was pretextual, but it also calls into question the overall credibility of his representations to the Court during his testimony concerning both whether or not there was consent and then to the extent that there was consent, whether or not that was voluntary. In regards to the communication in English, again, even the communication that was allegedly made, the exchange of ideas between Officer Bolger and Mr. Espinoza, that communication was inferred. And infer was not a word that I used. That was a word that Officer Bolger used. I inferred his consent because he followed my directions. His directions were stated in English, but they were corroborated or backed up by his hand gestures. So when his hands are in the air and he says, put your hands on the hood, and then Espinoza subsequently puts his hands on the hood, do we know that he's doing that voluntarily? I don't believe we do. And unfortunately, the individual who was in the best place to preserve the evidence for presentation to the Court failed to do so in some regard. Whether it was intentional, it was deliberate. Whether it was unintentional or we had faulty equipment that day, we don't know. But we don't have the evidence necessary to really make that conclusion. I think what is important in this case, again, is that the only time that Spanish language was definitively used with Mr. Espinoza, who the officer acknowledged was operating in a life where his primary language was Spanish, the only time that the Spanish language was actually used with Espinoza was presentation of a Miranda Rights card, which was done subsequent to the pat-down. And then, subsequently, the record also shows Espinoza was taken to police headquarters and he was interviewed with the assistance of a Spanish-speaking interpreter. That calls into direct question as to whether or not there was really this acknowledgment or understanding of ideas between the officer and the defendant on the roadside when, you know, a half an hour, hour later, we have a conversation with him where we talk about his involvement in the whole drug conspiracy, but that's done entirely in the Spanish language. So I think if you examine the Chaitis factors, if you do believe there was consent, which I don't believe there was, but if the court makes that finding, clearly there's sufficient record to support that any alleged consent was not voluntary. With that, I submit, Your Honor. Your Honors. Thank you. Thank you, Counsel. The case has been well briefed and argued, and we'll take it under advisement.